IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| ROBERT WEINERT, | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. | 09 C 6889 |
| | ) | | Blanche M. Manning |
| | ) | | |
| VILLAGE OF LEMONT POLICE DEPARTMENT, | ) ) | | |
| Defendant. | ) | | |

## MEMORANDUM AND ORDER

Plaintiff Robert Weinert learned it's a dog eat dog world after being passed over for the K-9 Officer position with the Village of Lemont Police Department. Not being one to roll over, Weinert sued the Village of Lemont for age discrimination and retaliation. The defendant has moved for summary judgment. For the reasons stated herein, the motion is granted in part and denied in part.

I.   Facts

Weinert was born August 20, 1963, and he has been employed as a police officer with the Village of Lemont Police Department since April 6, 1992. He has a high school diploma but no college degree.

While the defendant states that Chief of Police Kevin Shaughnessy's date of birth is September 29, 1953, this fact is not supported by a citation to the record. Shaughnessy was appointed Chief of Police of the Lemont Police Department some time in 2004. When Shaughnessy started as Chief of Police, he "brought in a different philosophy" to the department which was to "appoint capable, qualified people to any position." Shaughnessy Dep. at 307, 450. "Many of the issues [Shaugnessy] believed needed attention [in the department] could be traced directly back to a lack of supervision by the former administration." Interrogatory Answers at 2(c), Defs. Exh. B. According to him, accountability had not previously been enforced and as a result, "overall officer productivity was low and unacceptable." *Id*.

As part of his authority as Chief of Police, Shaughnessy has the power to purge, modify, revise and alter directives and General Orders of the Lemont Police Department at his discretion as he deems necessary to meet his goals and objectives for the department.

Sgt. Lehmacher had served as the K-9 Officer between 1990 and 1995, when he had only two years with the department. Officer Rob Borowski, who was hired after Officer Weinert, also

served as the K-9 Officer for some time before leaving for another position. Prior to that time, Officer Weinert had not submitted his name for the position. Officer Moranda had also been appointed the K-9 Officer in 2005 when he had 3 years with the department, but he declined the position and took a job with another police department. When Moranda declined the position, the department sent out a memorandum seeking interest in a replacement. Because no officers (including the plaintiff) responded, the department sold the dog.

In March 2007, the department announced that it was seeking candidates for the reinstatement of a K-9 Officer position. The announcement was sent to the entire department and contained no limitation on the eligibility of officers with only a certain amount of time with the department.

At that time, the K-9 Officer position was subject to the Lemont Police Department General Order 41.1.4, Subsection Q, which provides that applicants have:

> a. Full time status, non-probationary police officer with work performance, disciplinary and medical/sick leave records.
> b. A willingness to remain with the K-9 unit for at least seven years.
> c. A willingness (together with other family members) to care for and house the K-9 at the officer's residence with a secure outdoor area for the canine.
> d. A strong desire to work with K-9's and willingness to care for and train the animal.
> e. The ability to pass designated physical fitness and agility tests related to the tasks of canine handling.

Weinert disagrees with the first qualification. Specifically, he contends that the General Order in effect in March 2007 required in subsection (a) "At least five years of uniform patrol experience with satisfactory work performance, disciplinary and medical/sick leave records." According to Weinert, when General Orders are updated, officers sign off on "roll call training sheets" to ensure that all officers have viewed and understand the issues or the training involved. Weinert states that although there are roll call training sheets showing that officers had received and reviewed updates to other General Orders, Lemont has not produced a roll call training sheet for General Order 41.1. The defendant concedes that General Order 41.1 previously required that an officer have 5 years experience to qualify for the K-9 Officer position. However, the defendant contends that because the officer who was responsible for the amendments has died, the effective date of the amendment is unknown. The defendant further notes that GO 12.2 provides that the Chief of Police has the authority to modify any General Order and that the chief can "update, purge or revise" any order or directive at his discretion.

Although the defendant contends that the General Order also provides that the Chief of Police is responsible for the selection of the K-9 Officer, but does not provide for a selection process, the defendant fails to set forth a proper citation for this fact.

In 2007, three candidates expressed interest in the K-9 Officer position: the plaintiff, Brian Kondrat, and Brian Danaher. Danaher withdrew his name prior to the interviews for the position. Sergeant Don Jones and Commander Dan Tully interviewed Weinert and Kondrat and ultimately recommended to Chief Shaugnessy that Kondrat be appointed to the K-9 Officer position. Shaugnessy agreed and appointed Kondrat to the position on or about January 22, 2008.

Weinert filed his first EEOC charge on February 28, 2008, alleging age discrimination based on the denial of his promotion to the K-9 Officer position. On October 30, 2008, Weinert filed a second charge alleging age discrimination and retaliation. Specifically, Weinert alleged age discrimination and retaliation based on his failure to be appointed to the Officer in Charge position on or about July 23, 2008. Weinert filed the instant complaint alleging age discrimination and retaliation on November 2, 2009. Then, after the defendant's motion to dismiss the plaintiff's original complaint, Weinert filed a third EEOC charge on April 5, 2010, alleging various other instances of purported retaliation.

The remaining relevant facts are discussed as necessary in the analysis of Weinert's claims.

## II. Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Volenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Id*. To successfully oppose a motion for summary judgment, however, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, it must demonstrate that a genuine issue of fact exists. *See id.* at 587.

## III. Analysis

### A. *Age Discrimination*

To prove discrimination in violation of the ADEA, Weinert must establish that the defendant subjected him to an adverse employment action because of his age. *See Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). In other words, age must be the but-for causation for the alleged adverse action. *Gross v. FBL Fin. Servs., Inc.*, —— U.S. ——, 129 S.Ct. 2343, 2352, 174 L.Ed.2d 119 (2009). Weinert may attempt to prove discrimination by either the direct or indirect methods of proof. *Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010).

1.  <u>Direct method</u>

Under the direct method, Weinert "can meet his burden of proof by offering direct evidence of animus-the so-called 'smoking gun'-or circumstantial evidence which establishes a discriminatory motive on the part of the employer through a longer chain of inferences." *Id.* (*citing Mach v. Will County Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009)).[1]

A.  Direct evidence and circumstantial evidence

Direct evidence is evidence that would prove discriminatory intent without reliance on inference or presumption. *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003). Direct evidence is "akin to an admission by an employer." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Circumstantial evidence is evidence from which a jury might infer intentional discrimination but without a direct admission from the employer. *Id.* It includes: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Hemsworth v. Quotesmith.Com., Inc.*., 476 F.3d 487, 491 (7th Cir. 2007).

In support of his age discrimination claim, Weinert points to circumstantial evidence which he contends shows that he was qualified but was passed over for the position and the defendant's reason for doing so was pretextual. He also asserts that ambiguous statements by Shaugnessy constitute circumstantial evidence of discrimination. The court addresses these in turn.

*Pretext*. Weinert asserts that he was qualified to be a K-9 officer, Kondrat, who is outside the protected class, was selected over him, and the defendant's reason for not appointing him to the K-9 position is not worthy of credence. The defendant responds that Commander Tully and Sergeant Jones, who conducted the interviews for the K-9 Officer position, rated Kondrat higher

---

[1]Another court in this district has noted that it "share[s] in the Seventh Circuit's skepticism as to whether the burden-shifting approach retains vitality after *Gross*, because the evidence needed to make out a prima facie case of but-for causation under the direct method will be the same evidence a plaintiff would use to show that a defendant's stated reasons were merely a pretext for the adverse action taken against the plaintiff under the indirect, burden-shifting method." *Zitzka v. Village of Westmont*, 743 F. Supp.2d 887 (N.D. Ill. Sept. 28, 2010). The court, however, will assume both the direct and indirect methods can still be used absent definitive caselaw to the contrary.

than Weinert and recommended Kondrat to Shaugnessy.[2] According to the defendant, Tully and Jones concluded that Kondrat was more enthusiastic about the position, and that Weinert had a poor attitude. They communicated their conclusions to Shaugnessy, who appointed Kondrat. Moreover, the defendant points out that Kondrat had previously expressed interest in the K-9 Officer position while he was a probationary officer and had conducted research, which he shared with Shaugnessy and others, into restarting the K-9 Officer program. The defendant also notes, as discussed below, that officers with less than 5 years experience had been selected for the K-9 position in the past including Officer Moranda in 2005 and Sergeant Lemacher in 1990 or 1991.

Weinert asserts that the defendant's reasons for appointing Kondrat are suspect because Shaugnessy disregarded the police department's policy when appointing Kondrat. Specifically, Weinert contends that the version of General Order 41.1 applicable at the time required "[a]t least five years of uniform patrol experience with satisfactory work performance, disciplinary and medical/sick leave records," not just full-time status. According to Weinert, he had not just five years, but 15 years, experience, and an outdoor area for the dog. Kondrat, however, had only ten months of full-time regular duty police work at the time of the selection and lacked an outdoor secure area for a dog. Weinert also notes that Kondrat had never owned a dog at the time he applied to the K-9 Officer while Weinert had owned a dog for most of his life. Finally, Weinert contends that Shaugnessy told Kondrat before the interviews had even been conducted that Kondrat would be selected for the position and that Shaugnessy chose Tully and Jones to interview the candidates because they knew what he wanted.

The parties dispute a number of the facts just discussed, such as which General Order was in effect, whether it matters which one was in effect, and whether Shaugnessy told Kondrat ahead of time that he would be the next K-9 Officer. The court, however, need not sort out these issues because Weinert's next piece of evidence, the purported comments by Shaugnessy, allow Weinert to proceed to trial on the age discrimination claim.

*Shaugnessy's purported statements*. Weinert argues that Shaugnessy's comments to him that Kondrat was hired for the K-9 position because he was a "young go-getter", a "young officer" and a "young kid" constitute circumstantial evidence of discrimination. Weinert describes the conversation with Shaugnessy as follows:

> Q:   . . . So [Shaugnessy] said, I selected Kondrat as the K-9 officer?
> . . .
> A:   . . . Yes.
> Q:   And what else did he say if anything?

---

[2]The parties agree that the point count by Sergeant Jones for Weinert should have been 37, not the 34 that is reflected on the bottom of Jones' interview sheet. Moreover, Jones' score sheet for Kondrat seems to show different scores (either 4 or 5 points) for the same answer on some of the questions. Regardless, Kondrat's score from Jones appears to be at the most 45, and at least 40, both higher than Weinert's 37. *See* Def's. Exh. P.

Page 5

> A: He then went on to refer to Kondrat as this young officer, this young kid, this young go getter.
>
> . . .
>
> Q: Those are all phrases, they're not whole sentences. Was he speaking in not whole sentence to you?
>
> A: No, he added things to it.
>
> . . .
>
> A: . . . [Each] sentence started off with a youthful attribute and then it referred to goes out and writes tickets. Writes a bunch of parking tickets. I say the village is low on funds and he goes and writes a bunch of parking tickets. You don't write any.
>
> Q: Anything else?
>
> A: He said I hadn't done anything for him in four years.
>
> Q: Okay.
>
> A: And he finished by saying that I don't represent the esprit de corps of the Lemont Police Department.

Weinert Dep., Defs. Exh. A-1 in Support of Reply, pp. 129, l.8 - 130, l.10.

An "isolated comment or 'stray remark' is typically insufficient to create an inference of discrimination, but it may suffice if it (1) was made by the decision-maker, (2) around the time of the decision, and (3) referred to the challenged employment action." *Mach v. Will County Sheriff*, 580 F.3d 495 (7th Cir. 2009). *See also Olson v. N. FS, Inc.*, 387 F.3d 632, 635 (7th Cir. 2004) ("A statement can be direct evidence of discriminatory intent where the statement is made around the time of and in reference to the adverse employment action ."). The statements were purportedly made by the decision-maker, Shaugnessy, around the time of the decision, and in reference to the fact that the position went to Kondrat and not Weinert.

Though Shaugnessy denies having made those statements, it is not the court's role on summary judgment to decide who is telling the truth. That task is left to the jury at trial.

Also not availing is the defendant's argument that the statements, even if true, are only descriptive statements versus evidence of discrimination. In support of its position, the defendant cites to *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405 (7th Cir. 1984), in which the court found that a letter in which the division manager told the company president that he should hire a "bright young individual" and a statement by another executive to the president that the plaintiff should not be discharged until the company found a younger replacement were insufficient to establish age as the determining factor in plaintiff's termination. *LaMontagne, however,* is distinguishable in one important way–the comments in that case about hiring a "bright young individual" and a "younger" person were not made by the decisionmaker; rather the comments were made *to* the decisionmaker. As the Seventh Circuit noted,

> [w]hile [the president] consulted with Martin and David about his hiring and discharge decisions, there is no evidence that he needed their concurrence to act or

> that such decisions had to be joint. It is also clear that [the president] alone decided to discharge La Montagne and that he alone carried out the decision. Thus the relevant inquiry is into [the president's] motivation; to prevail, La Montagne must show that his age was a determining factor in [the president's] decision to discharge him.
>
> Martin's statement to [the president] shows that Martin wanted La Montagne's replacement to be a younger man. But Martin's desires are not probative, and a reasonable jury could not infer from Martin's statement alone that [the president] wanted to replace La Montagne with a younger man, still less that [the president] discharged La Montagne because of his age

*Id.* (citations omitted). The Seventh Circuit rejected the evidence not on the ground that it was factual or descriptive, but because the statements, made by individuals other than the decisionmaker, were not, absent more, probative of the decisionmaker's reason for terminating the plaintiff. Here, the comments about Kondrat being a "young go getter," a "young kid," and a "young officer" were made by the decisionmaker, Shaugnessy, near the time of the decision and in reference to his decision to hire Kondrat over Weinert.

Accordingly, because Shaugnessy's purported statements are enough to allow the plaintiff to survive summary judgment, the defendant's motion for summary judgment on the age discrimination claim is denied. Because the plaintiff has survived summary judgment under the direct method, the court need not address the other circumstantial evidence discussed by the parties in their briefs or the indirect method of proof.[3]

B.   *Retaliation*

As stated by the Seventh Circuit,

> [t]o prove retaliation in violation of the ADEA, [the plaintiff] must show that he engaged in statutorily protected activity, that he suffered a materially adverse action, and that the two are causally related. *Horwitz v. Bd. of Educ.*, 260 F.3d 602, 612 (7th Cir. 2001). Under the ADEA retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor.

*Barton v. Zimmer*, 662 F.3d 448, 455 (7th Cir. 2011)

"'Materially adverse actions' are those that might dissuade a reasonable employee from engaging in protected activity; this category sweeps more broadly than the 'adverse employment

---

[3]The parties do not discuss what remedies, if any, the plaintiff has under the ADEA. *See, e.g., Barton v. Zimmer*, 662 F.3d 448, 454 (7th Cir. 2011). Accordingly, the court does not address the issue.

actions" required to sustain a discrimination claim.'" *Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652 (7th Cir. 2011) (internal citations omitted). Thus, "[t]he standard for what may constitute an adverse employment action is more flexible in the context of a retaliation claim than in the context of a substantive discrimination claim because Title VII depends for its enforcement on employees' willingness to file complaints and act as witnesses." *MacGregor v. DePaul University*, 2010 WL 4167965, at *5 (N.D. Ill. Oct. 13, 2010) (citations omitted). Finally, "context matters to the determination of what constitutes a materially adverse action." *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 741 (7th Cir. 2011).

As an initial matter, the court notes that Weinert's retaliation claim is significantly weakened if not doomed because he fails to attempt to make any showing of causation. This appears to be due, at least in part, to the fact that he frames the retaliation claim as a hostile work environment claim. According to Weinert, certain of the defendant's actions were retaliatory because they created a hostile work environment. However, Weinert cannot escape the requirements under Seventh Circuit precedent for establishing a retaliation claim simply by referring to it instead as a hostile work environment claim. The court will review the alleged retaliatory actions pursuant to the legal framework applicable to retaliation claims, as detailed above. Given that Weinert fails to abide by the analysis set forth by the Seventh Circuit, the court has done its best to address the retaliation claims with the information and arguments presented to it.

According to Weinert, the materially adverse actions at issue include the following: (1) after Shaugnessy heard rumors that Weinert would be filing an age discrimination lawsuit, Shaugnessy told Weinert that he did not represent the "esprit de corps" of the department; (2) Shaugnessy took away Weinert's supervisory responsibilities at his earliest opportunity; (3) Shaugnessy removed Weinert from two supervisory positions (Officer in Charge and Field Training Coordinator) just months after Weinert filed his first EEOC charge; (4) Shaugnessy treated Weinert differently from his peers; (5) Shaugnessy personally targeted Weinert by looking for fault with his job performance; (6) Shaugnessy "picked on" Weinert by getting angry over simple acts and by requiring him to work the night shift; (7) Shaugnessy influenced the "independent" performance ratings given to Weinert; (8) Weinert's sergeants and a commander agree that Shaugnessy is retaliating against Weinert; and (9) after Weinert filed an EEOC charge alleging age discrimination, Shaugnessy looked for problems with Weinert's job performance. The court addresses these in turn.

With respect to Shaugnessy's comment that Weinert did not represent the *esprit de corps* of the Lemont Police Department, the court concludes that this statement does not constitute an action that would dissuade an employee from engaging in protected activity. *MacGregor*, 2010 WL 4167965, at *6 ("The language 'materially adverse' separates 'significant from trivial harms' and clarifies that adverse employment actions do not encompass 'those petty slights or minor annoyances that often take place at work and that all employees experience.'") (citation omitted).

As to the second action, that Shaugnessy took away Weinert's supervisory

responsibilities, Weinert contends that he filed his age discrimination charge on February 28, 2008, and that when Sergeant Hess retired in July 2008, Shaugnessy appointed Officer Mezyk instead of Weinert, to Hess' position. Weinert argues that "[b]ecause Shaugnessy made Weinert, an officer with almost twenty years of experience, report to Mezyk, a person with half his experience, a jury could find that Shaugnessy sought to humiliate Weinert." Response at 17. Weinert, however, fails to support this assertion with any citations to the record indicating that this event even occurred, let alone pointing to Mezyk's qualifications, what the requirements of the position were, whether Weinert was even eligible or applied for the position, or why Shaugnessy chose Mezyk over Weinert. Weinert's statement that "he has never known of a time when a senior officer has reported to a junior officer," response at 18, is insufficient to create a genuine issue of material fact as to whether the appointment of Mezyk over Weinert constituted a materially adverse action.

Weinert next argues that Shaugnessy removed him from the Officer in Charge position and the Field Training Coordinator position months after he filed his age discrimination charge. The assertion regarding the Officer in Charge position appears to mirror the event discussed above, which is that when Sergeant Hess retired, Shaugnessy made Officer Mezyk, who had less seniority than Weinert, the Officer in Charge. Prior to addressing the substance of this argument, the court notes again that Weinert fails to cite to the record in his discussion of this issue. For instance, Weinert asserts that

> To the EEOC Lemont stated (in its verified response (that it chose Mezyk from the Sergeants Eligibility List because Shaugnessy believed Mezyk was the best person for the assignment at the time. Now, Lemont argues that it allocated opportunities to be a [sic] longer-term OICs among officers on its Sergeants Eligibility List. But Mezyk could not be promoted to sergeant because he was fourth on the list and only the top three officers (which included Weinert) could be promoted. Additionally, at the time Shaugnessy prevented Weinert from performing OIC duties, only Panush and Weinert had been longer-term OICs and during these periods they were always the most senior officer on the shift. A jury could find that Shaugnessy deliberately humiliated Weinert by requiring him to report to [sic] junior officer.
> . . .
>
> . . . Shaugnessy later prevented Weinert from being the OIC again by assigning a sergeant to his shift, and temporarily "bumping" Weinert out of the OIC role, despite the fact that this "bump" caused Lemont to incur significant cost. Then, in November 2010, Shaugnessy changed the qualifications to be the OIC and removed Weinert from the position permanently.

Response at 18-19. None of the factual statements contained in the excerpt above include a citation to the record. Thus, the court has no way of verifying the statements. It is simply not this court's job to figure out which statements of fact or responses support (or contradict) a party's arguments.

As part of this same argument, Weinert contends that he was stripped of his duties as the Field Training Officer Coordinator in July 2008, the same time he was removed as OIC. The defendant contends that the action was not materially adverse because the FTO Coordinator position is not supervisory and does not involve any additional compensation. The defendant acknowledges that another officer, Scott Hugo, was appointed as FTO in July 2008. According to the defendant, Hugo replaced Weinert at that time because the FTO Coordinator was a temporary position, Hugo had researched another police department's FTO program and indicated that he was willing to implement the same program in Lemont, and Shaugnessy was "impressed and encouraged that [Hugo] was trying to be an active contributing member of the department." Shaugnessy Dep. Def's Exh. C at 404, ll. 19-25.

Ultimately, even assuming that the appointment of Mezyk as the sergeant and the Officer in Charge and the replacement of Weinert with Officer Hugo as the FTO Coordinator were materially adverse actions, Weinert has failed to establish any causal link. Weinert's failure to even mention the issue is significant as the Seventh Circuit has noted that "[c]ausality is typically one of the highest hurdles retaliation plaintiffs must clear." *Benuzzi*, 647 F.3d at 665. Without making reference to the causal requirement link at all, Weinert only implies that because the appointment of Mezyk occurred after he filed his age discrimination claim, it must have been retaliatory. But, "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (citations omitted). "Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Id.* As noted, Weinert fails to make any such showing and, in any event, absent more, cannot show that a separation of five months is sufficient temporal proximity to establish causation. *Kodl v. Board of Educ., School Dist. 45, Villa Park*, 2006 WL 2192014, at *16 (N.D.Ill. Aug.1, 2006) (finding two-month separation between complaint and transfer insufficient to establish causation), and cases cited therein. *See also Benuzzi*, 647 F.3d at 666 ("The two-month time frame separating Benuzzi's first amended EEOC complaint and her second suspension is, without more, insufficient to give rise to . . . [an] inference [of retaliation]".).

Weinert also asserts that Shaugnessy treated him differently in retaliation for having filed the age discrimination charge. For example, Weinert argues that Shaugnessy "began writing personal comments to Weinert complaining about his job performance" on closing complaint verification forms which describe each incident in which an officer is involved. Response at 19. Weinert again fails to cite to the record in support of this statement. The only statement of fact that the court located in support, PSOF ¶ 17, indicates that on one of Weinert's closing complaint verification forms, Shaugnessy wrote "Any arrest of Resident made on Roberta?" Shaugnessy directed Weinert to prepare a written response to this question. Weinert also points out that Shaugnessy questioned Weinert's April 8, 2008, issuance of a warning ticket by writing "speeds a little high. Residential area, lots of kids" and put it into Weinert's file. The court finds these actions to be too trivial to constitute material adverse actions, and in any event, as before, Weinert makes no effort to establish causation.

Weinert also notes that on or about January 8, 2008, Shaugnessy criticized Weinert for

not handling an incident that was outside the Lemont jurisdiction. This fact again is unsupported by a citation to the record and cannot constitute retaliation as it occurred prior to Weinert having filed his age discrimination claim.

According to Weinert, another example of being treated differently occurred when Shaugnessy noticed Weinert eating a late lunch in January 2010 and questioned Sergeant Lemacher about it. Although Lemacher stated that he had approved the later lunch, Shaugnessy purportedly reviewed Weniert's lunch breaks over the previous six months but not those of other officers. This action, however, is not materially adverse because nothing came of it and the record does not reflect that Weinert was even aware of Shaugnessy's research regarding his late lunches.[4] Weinert also points out that Shaugnessy asked Sergeant Lemacher whether Weinert was using his mobile video recorder, which records traffic stops. Lemacher testified that Shaugnessy had not asked him whether other officers had been using the mobile video system. Again, the court concludes that Shaugnessy's inquiry regarding the mobile device recorder is not materially adverse. *Benuzzi*, 647 F.3d at 665 ("an empty threat that quickly dissipates before the employee becomes aware of it does not constitute a materially adverse action"). As to Weinert's assertion that Officer Ellingsworth told him that Shaugnessy asked another officer how many calls Weinert and a fellow officer handled compared to other officers, this statement is inadmissible hearsay.

As the next purported materially adverse action, Weinert argues that officers who witnessed a shift change were required to write memoranda about an order Weinert had made regarding the shift change. The court, however, is unable to locate Weinert's citation to the record, *see* Plaintiff's Additional Facts ¶ 29 citing to Exh. 34, in support of this assertion. Moreover, Shaugnessy testified that he directed another officer to look into the incident and did not order any other officers to write anything. In light of Shaugnessy's uncontradicted statement, the court concludes that no materially adverse action occurred.

Weinert also asserts that Shaugnessy asked a sergeant whether Weinert was using his mobile video recorder. But Weinert acknowledges that Shaugnessy asked about all of the officers' use of the device and that Shaugnessy inquired further into Weinert because he was (incorrrectly) told that Weinert was not using his system. This event does not qualify as a materially adverse action because the inquiry did not materialize into any reprimand or action against Weinert.

In addition, Weinert refers to other instances in which Shaugnessy allegedly "picked on" him or "looked for problems" with his performance after he filed his age discrimination charge. For example, Weinert notes that in March 2008, in an e-mail, Shaugnessy directed him to write a memorandum as to why Weinert, as the union steward, approached the village administrator

---

[4]To the extent that Weinert also contends that Shaugnessy brought up the late lunch (to whom is not clear) "repeatedly," Response at 23, this is not supported by a citation to the record and, in any event, does not constitute a materially adverse action.

directly regarding a grievance.  Shaugnessy testified that he believed that Weinert bypassed the proper procedure for sending a memo to the village administrator regarding a grievance and that it should have gone through him, as the Chief of Police, first.  Weinert responded to Shaugnessy's request and Weinert was not disciplined.  The court concludes that requiring an employee to draft a memo regarding an action he took and which did not result in any discipline, was not placed in his personnel file and does not have any other consequences is not a materially adverse action.

Weinert further points out that he was told by a sergeant that Shaugnessy was upset that Weinert had documented that he accepted coffee and cookies as a gratuity.  To the extent that the court can even consider the sergeant's statement as it appears to be inadmissible hearsay, Weinert acknowledges that the police department warned officers not to accept gratuities and he further does not point to any discipline or consequence related to Shaugnessy's reaction. Accordingly, the court finds the fact that Shaugnessy was upset about Weinert having accepted coffee and cookies not to be a materially adverse action.

Weinert's reference to being assigned to the night shift is not supported by a citation to the record and therefore, will not be considered by the court.

The next purported act of retaliation is Shaugnessy's alleged "influence" on the independent performance evaluations.  Specifically, Weinert contends that with respect to his 2008-09 performance evaluation, Shaugnessy asked Sergeant Lemacher why he had given Weinert such high ratings and Shaugnessy purportedly told Lemacher that such high ratings for Weinert would hurt Shaugnessy in his lawsuit.  As an initial matter, the statement of fact that Weinert points to in support of this assertion does not contain any mention of Shaugnessy purportedly stating that the high ratings would hurt Shaugnessy in his lawsuit.  Indeed, according to the citation provided by Weinert, when Lemacher was questioned at his deposition as to whether Shaugnessy mentioned the lawsuit when asking him about the ratings he had given Weinert, Lemacher responded that he did not recall that and that "[the lawsuit] has nothing to do with it."  Pltfs. Exh. G at 142.  As to Shaugnessy's inquiries regarding Lemacher's ratings, Weinert does not state that the ratings were altered based on Shaugnessy's questions.

Weinert further asserts that Shaugnessy also interfered with Weinert's performance evaluation in May 2010.  While it is not entirely clear exactly how that alleged interference manifested itself, Weinert notes that "Shaugnessy's testimony about the evaluations is conflicting."  Response at 24.  Specifically, he points out that Shaugnessy testified that he was not present, may have walked through the room and that he instructed the sergeants how to use the evaluation form he adapted and instructed the supervisors as to what the evaluation categories meant.  Because none of this evidence points to a material adverse action, the court disregards it. Weinert also notes that Sergeant Miller, who attended Weinert's May 2010 evaluation, testified that Shaugnessy was present.  Moreover, during the evaluation, Weinert points to evidence supporting that Shaugnessy sat at the head of the table next to Weinert's supervisor and reviewed Weinert's personnel file.  As just noted, however, none of these purported actions constitute material adverse actions.  In addition, Weinert's assertion that his was the only personnel file

Page 12

"reviewed during the 2010 evaluations" is not supported by the statement of fact cited.

Weinert also contends that Shaugnessy constantly interjected and solicited criticism about Weinert during the evaluation and kept saying "now remember, I'm not here. . . ." Again, however, the statement of fact cited by the plaintiff does not support the assertion.

To the extent that Weinert refers to other sergeants and commanders who "agree that Shaugnessy is retaliating against Weinert," this statement is a nonstarter in terms of the retaliation claim because Weinert fails to point out how his colleagues' beliefs about whether he was being retaliated against are relevant to the applicable legal analysis. This is particularly true given that the court has determined that none of the alleged retaliatory acts are materially adverse.

Weinert also contends that the above-described events and conduct created a hostile work environment and thus constituted retaliation for Weinert's complaint of age discrimination. The court disagrees. In order to establish a hostile work environment, Weinert must demonstrate the existence of the following four factors: (1) he was subject to unwelcome harassment; (2) the harassment was based on his age; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for employer liability. *Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008). A hostile work environment must be "'so severe or pervasive as to alter the conditions of employment and create an abusive working environment.'" *Rhodes v. Ill. Dep't. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) (*quoting Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002)). Moreover, the working environment must be "both subjectively and objectively" abusive. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005). In determining whether a plaintiff has established a hostile work environment, the court will look at the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Ezell*, 400 F.3d at 1047–48 (citation omitted).

Weinert has failed to make such a showing. Having considered the frequency of the alleged acts, their severity, the fact that none were physically threatening, and the lack of any evidence supporting a finding that they interfered with Weinert's work performance, the court concludes that they do not rise to the level of establishing a hostile work environment. Even assuming that they do, Weinert has failed to establish causation between these acts and the fact that he filed an EEOC charge.

For all of these reasons, the court grants summary judgment to the defendant on the retaliation claim.

C.  *Statute of Limitations*

The defendant also argues that absent a hostile work environment claim, several acts of

purported retaliation are untimely. However, because the court has already concluded that the acts are not materially adverse and in any event, Weinert fails to demonstrate causation, the court need not address this argument.

## IV. Conclusion

For the reasons stated above, the defendant's motion for summary judgment [98-1] is granted in part and denied in part. The motion is denied with respect to the age discrimination claim and granted with respect to the retaliation claim. The parties are urged to engage in settlement discussions either with or without the assistance of the magistrate judge. Status is set for March 27, 2012, at 11 a.m. in order to set a trial date.

**DATE**: March 1, 2012

_____
**Blanche M. Manning**
**United States District Judge**